[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-15925

_____

Agency No. A088-685-703

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 4, 2011
JOHN LEY
CLERK

LUCIA I. MEDINA MARTINEZ,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(February 4, 2011)

Before BARKETT, MARCUS and FAY, Circuit Judges.

MARCUS, Circuit Judge:

This is one of those difficult cases where the law yields a conclusion that is

onerous and, at its core, inequitable. Lucia Medina Martinez seeks review of the

Board of Immigration Appeals' ("BIA") decision affirming the denial of her petition for cancellation of removal under 8 U.S.C. § 1229b(b)(1). The BIA found that Martinez's 2007 Florida conviction for child neglect was a "crime of child abuse," as used in 8 U.S.C. § 1227(a)(2)(E)(i), precluding her eligibility for the Attorney General's discretionary ability to cancel a removal proceeding on hardship grounds. On appeal, Martinez argues that her conviction for child neglect does not meet the BIA's definition of a "crime of child abuse." For the reasons we detail below, we are regrettably constrained to deny her petition for review.

## I.

Martinez, a native and citizen of Mexico, entered the United States illegally in 1994 when she was fifteen years old. After she entered the United States, Martinez married a year later and had two children, Alexander and Astrid, in the United States. After four years of marriage, Martinez divorced her husband because he was abusive. She then moved from California to Florida, where she met Arnoldo Cortez. Martinez lived with Cortez for five years before they married in 2004. Martinez now has six children, all of whom were born in the United States.

In 2006, Astrid, who was then seven years old, told Martinez that Cortez had touched her vaginal area and her breasts. This molestation appears to have occurred on multiple occasions when Astrid was seven years old. Martinez

2

initially kicked Cortez out of their home, but did not call the police because she was afraid that her children would be taken away from her. Martinez confided in her pastor about the incident, and he provided her with guidance. He told her that he would speak with Cortez and advised her to allow Cortez to return to her home because he was the father of four of her children, including a newborn baby, and because he was her husband.[1] Based on her pastor's advice, Martinez did not report the crime and allowed her husband to return while Astrid continued living in the home.

Martinez, however, was deeply troubled by her pastor's advice and sought additional counseling through her church about whether she should have allowed Cortez to return home. After learning of Cortez's conduct, the counselor, with Martinez's concurrence, notified the police, and Cortez was arrested for sexually

---

[1] Martinez's testimony before the immigration judge included the following relevant colloquy:

Q. . . . So tell me about it. You went to talk to the pastor and what happened?

A. He told me he was going to talk to my husband because what had occurred wasn't right. I told him not to because I no longer wanted to live with him because of what had occurred. But he [w]as telling me I should think about the other children and the baby had just been born. And I allowed him to return to the house. I did not feel well living with him. I couldn't sleep in peace. So I went to a counselor to ask what I should do. She told me what to do, that she was going to file a report, and I said to her that it was all right. What I told her is that all I wanted was for my children not to suffer more trauma, and she said they were going to go there and that he was going to be arrested, and that they were not going to take my children away. And that -- well, well, you know. They were going to help me with the children, I wasn't going to be left alone.

molesting Astrid. As Martinez expressed it, ". . . all I wanted was for my children not to suffer more trauma . . ." There were no alleged incidents of molestation during the three weeks that Martinez allowed Cortez to return to their home. The state of Florida subsequently removed Martinez's children from her home, and charged Martinez with child neglect in violation of Fla. Stat. § 827.03(3)(a), (c). Martinez did not contest the charges, instead pleading no contest in July 2007. She pled no contest because she believed that such a plea would allow her children to be returned to her care and custody as soon as possible. Martinez was sentenced to two days of confinement, with credit for two days served, 364 days of probation, seventy-five hours of community service, and other various fines. Cortez was convicted of child molestation and is currently serving a fifteen-year prison sentence. Soon after her conviction, on August 17, 2007, upon motion of the Department of Children and Family Services, all six children were returned to the custody and care of their mother.

In September 2007, the Department of Homeland Security ("DHS") issued Martinez a Notice to Appear, charging her with removability under 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled. Martinez conceded removability at an initial hearing, and she applied for cancellation of removal and adjustment of status for certain nonpermanent residents, under 8 U.S.C. § 1229b(b)(1). After a hearing, the immigration judge

4

found Martinez removable as charged, and denied her application for cancellation of removal, because her conviction for a "crime of child abuse" made her statutorily ineligible for cancellation of removal under 8 U.S.C. § 1229b(b)(1)(C). The BIA dismissed Martinez's appeal, finding that her Florida conviction for child neglect was a conviction for a "crime of child abuse."

## II.

Martinez places a single question before us: whether a conviction for child neglect under Fla. Stat. § 827.03(3) constitutes a "crime of child abuse" under 8 U.S.C. § 1227(a)(2)(E)(i). While discretionary decisions related to the denial of cancellation of removal are not reviewable by this Court, 8 U.S.C. § 1252(a)(2)(B)(i), we can consider, de novo, Martinez's claim to the extent that it presents a question of law related to statutory eligibility for cancellation of removal, 8 U.S.C. § 1252(a)(2)(D); Martinez v. U.S. Att'y Gen., 446 F.3d 1219, 1221-23 (11th Cir. 2006).

The plain language of the Immigration and Nationality Act (the "INA") permits the Attorney General to exercise his discretion to cancel the removal of a nonpermanent resident, such as Martinez, only if that nonpermanent resident meets the four requirements outlined in 8 U.S.C. § 1229b(b)(1).[2] For our present

---

[2] The Attorney General's discretion to cancel an order of removal is limited by 8 U.S.C. § 1229b. Under that statute, the Attorney General can exercise his discretion to cancel the removal of an alien if certain criteria are met by that alien. See Lopez v. Gonzales, 549 U.S. 47,

purposes, we are concerned only with the third requirement, that the alien "has not been convicted of an offense under section . . . 1227(a)(2)" of the INA. 8 U.S.C. § 1229b(b)(1)(C). Among the offenses listed in § 1227(a)(2) are "crimes against children." 8 U.S.C. § 1227(a)(2)(E). Specifically, the statutory provision says that "[a]ny alien who at any time after admission is convicted of . . . a crime of child abuse . . . is deportable." Id. § 1227(a)(2)(E)(i). The term "crime of child abuse," as used in 8 U.S.C. § 1227(a)(2)(E)(i), is not defined in the INA. However, the BIA has supplied definitions of a "crime of child abuse" in Matter of Velazquez-Herrera, 24 I & N Dec. 503 (BIA 2008) and Matter of Soram, 25 I & N Dec. 378 (BIA 2010).

In Velazquez-Herrera, the BIA "broadly" defined the term "crime of child abuse" as "any offense involving an intentional, knowing, reckless, or criminally negligent act or omission that constitutes maltreatment of a child or that impairs a child's physical or mental well-being, including sexual abuse or exploitation." 24 I

---

50 (2006). For nonpermanent residents, such as Martinez, the following four criteria must be met. First, the alien must be "physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application." 8 U.S.C. § 1229b(b)(1)(A). Second, the alien must have "been a person of good moral character during such period." Id. § 1229b(b)(1)(B). Third, the alien must not have "been convicted of an offense under section 1182(a)(2), 1227(a)(2), or 1227(a)(3) of this title, subject to paragraph (5)." Id. § 1229b(b)(1)(C). And, finally, the alien must "establish[] that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." Id. § 1229b(b)(1)(D).

& N Dec. at 512. The BIA further indicated that, "[a]t a minimum, this definition encompasses convictions for offenses involving the infliction on a child of physical harm, even if slight; mental or emotional harm, including acts injurious to morals; sexual abuse, including direct acts of sexual contact." Id. In Soram, the BIA quoted extensively from Velazquez-Herrera, finding that a "crime of child abuse" does not require proof of actual harm or injury to the child by the petitioner. 25 I & N Dec. at 381. In addition, the BIA clarified that the crime of child neglect can be a "crime of child abuse" under the INA. Id.

Because Velazquez-Herrera and Soram are precedential opinions of the BIA decided by three-member panels, under Chevron, we defer to their interpretation of "crime of child abuse" so long as the law is ambiguous and the BIA's determination is reasonable and does not contradict the clear intent of Congress. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44 (1984); Chen v. U.S. Att'y Gen., 565 F.3d 805, 809 (11th Cir. 2009) (noting that "[t]he degree of deference is especially great in the field of immigration") (internal quotation marks omitted); Quinchia v. U.S. Att'y Gen., 552 F.3d 1255, 1258 (11th Cir. 2008) (explaining that Chevron deference is only appropriate in cases involving precedential three-member decisions of the BIA). The INA is ambiguous because it provides no definition of the term "crime of child abuse." And, because neither party challenges Velazquez-Herrera or Soram as being

7

unreasonable, we assume that the BIA's definition of a "crime of child abuse" is reasonable.

The Florida law under which Martinez was convicted categorically meets the definition of a "crime of child abuse" under the INA. The pertinent statute says that a person who "willfully or by culpable negligence neglects a child without causing great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the third degree." Fla. Stat. § 827.03(3)(c). The statutory scheme defines "neglect of a child" as:

> 1. A caregiver's failure or omission to provide a child with the care, supervision, and services necessary to maintain the child's physical and mental health, including, but not limited to, food, nutrition, clothing, shelter, supervision, medicine, and medical services that a prudent person would consider essential for the well-being of the child; or
>
> 2. A caregiver's failure to make a reasonable effort to protect a child from abuse, neglect, or exploitation by another person.

Id. § 827.03(3)(a). "Neglect of a child may be based on repeated conduct or on a single incident or omission that results in, or could reasonably be expected to result in, serious physical or mental injury, or a substantial risk of death, to a child." Id.

There is no question that all of the conduct criminalized under Fla. Stat. § 827.03(3) constitutes a "crime of child abuse" under the BIA's definition of that term in Velazquez-Herrera and Soram. Whether committed willfully or with culpable negligence, the BIA could reasonably determine -- as it did -- that child

8

neglect is a "crime of child abuse." Indeed, the BIA's definition of a "crime of child abuse" expressly refers to an "intentional, knowing, reckless, or criminally negligent act or omission that constitutes maltreatment of a child . . . including sexual abuse." Velazquez-Herrera, 24 I & N Dec. at 512. In addition, the BIA specified that it had read "broadly" the term "crime of child abuse," which encompasses a wide range of standards for intent. Id.

Martinez also argues that she did not commit a "crime of child abuse," because the Florida statue allows a conviction for a "failure to provide care," and that, Martinez argues, requires merely a risk of harm to a child, and not a showing of actual injury to the child. However, as is described above, Soram clearly and unquestionably precludes this argument. The BIA has determined that a "crime of child abuse" under the INA does not require proof of an actual injury or harm to the child. Soram, 25 I & N Dec. at 381. Accordingly, Martinez's argument that she did not commit a "crime of child abuse" because there is no evidence that any physical harm was inflicted upon Astrid as a result of Cortez's return to the family home for three weeks is unavailing.

Similarly, Martinez's argument that she did not commit a "crime of child abuse" because she could have been convicted for either a failure to provide adequate supervision or a failure to protect under Fla. Stat. § 827.03(3)(a) is without merit. A conviction on either ground would fall within the BIA's broad

definition of a "crime of child abuse," because either creates an "impair[ment of] a child's physical or mental well-being," which <u>Velazquez-Herrera</u> holds is the definition of a "crime of child abuse." <u>Velazquez-Herrera</u>, 24 I & N Dec. at 512. Indeed, <u>Velazquez-Herrera</u> pointed out that the above-quoted definition of a "crime of child abuse" would "subsume most, if not all, crimes of 'child neglect.'" <u>Id.</u> at 512 n.14. And, again, as was made clear in <u>Soram,</u> no actual injury to the child is required; a failure to prevent or avoid the risk of harm is enough. 35 I & N Dec. at 381. Accordingly, a failure to provide adequate supervision as well as a failure to protect, even if the child is not physically harmed, would still impair the child's mental well-being; thus, the BIA could find that either is a "crime of child abuse" under the INA.

Martinez's conviction for child neglect under Florida law, therefore, qualifies as a "crime of child abuse," and the BIA did not commit legal error in concluding that this conviction precluded her eligibility for cancellation of removal under 8 U.S.C. § 1229b(b)(1).

While we are constrained by the law to reach this result, because it yields a profoundly unfair, inequitable, and harsh result, we urge the Attorney General to closely review the facts of this heartbreaking case once again.

As we understand the basic facts, Martinez arrived in this country when she was only fifteen years old, and she has continued to reside here for more than

10

sixteen years. She has six children, all of whom were born in the United States, and she has now left two abusive spouses. Martinez was not personally involved in the sexual abuse of Astrid, nor is it alleged anywhere that she knew this abuse had occurred before Astrid told her about it. Indeed, in August 2006, Martinez noticed that Astrid was acting strange, and she spoke to the child to find out what was wrong. Upon learning from Astrid that Cortez, Martinez's husband and the father of her four younger children, had inappropriately touched Astrid, Martinez immediately kicked Cortez out of their home. Martinez was so distraught over her husband's actions towards his step-daughter that she consulted her pastor. It was only on her pastor's advice that she decided not to contact the police and to allow Cortez to return to their home; this advice appears to have been largely based on the fact that, during this time, Martinez and Cortez had four children together, including a newborn son, and on the pastor's belief that Martinez should remain loyal to her husband. Concerned that her pastor's guidance was not correct, Martinez sought additional counseling through her church within weeks of Cortez's return regarding whether to allow her husband to stay in their home. Martinez told her counselor that she was afraid to contact the police because she feared the authorities would take her six children away from her. After their session, the counselor notified the police, ironically with Martinez's concurrence.

11

Soon thereafter, Martinez's children were removed from her custody and sent to live with Cortez's mother, and Martinez was prosecuted for child neglect.

The entire basis of Martinez's child neglect conviction was that she allowed her husband, and the father of several of her children, to return to their home for a period of three weeks on the unambiguous advice of her pastor. In the process of seeking additional guidance, Martinez's case was turned over to law enforcement, and both she and her husband were arrested and prosecuted. Martinez chose not to contest the charge of child neglect, which was based only on the fact that she had allowed Cortez to return to their home for three weeks after Astrid had told her about her husband's conduct. In July 2007, Martinez was sentenced to two days of confinement, with credit for two days served, 364 days of probation, seventy-five hours of community service, and other various fines. There is no allegation that Astrid suffered any molestation at the hands of Cortez during the three-week period he spent in their home after Martinez initially kicked him out. On August 17, 2007, approximately ten months after the children were taken from Martinez's custody and only one month after her conviction, upon the motion of the Department of Children and Family Services, all six children were returned to her custody and care; the State of Florida does not appear to be concerned that Martinez is a neglectful or otherwise unfit parent. And there is no danger that

12

Cortez will come into contact with Astrid while she lives with her mother; he is currently serving a fifteen-year prison sentence.

Simply put, this case calls for more mercy than the law permits this Court to provide. There is no evidence that Martinez has ever been anything less than a caring parent. Her initial reaction to learning from Astrid that her step-father had inappropriately touched her was to immediately remove Cortez from their home. She also repeatedly sought guidance from multiple sources (including her pastor), who gave her conflicting advice about how to handle the situation. Martinez has six young children who are all United States citizens. Four of Martinez's young children are also Cortez's children, and their father will remain in the United States long after they would be forced to leave the country if their mother is forcibly removed. Martinez has lived in the United States since she was fifteen years old, which is more than half of her lifetime. Under the peculiar facts of this case, removing Martinez and her six young children to Mexico, a country in which they no longer have any relatives, would work an extreme hardship on a family that has already been forced to endure domestic abuse, the molestation of a child by her step-father, and the incarceration of a father and husband. We, therefore, urge the Attorney General of the United States to review this matter again.[3]

---

[3] The Clerk of Court is directed to send a copy of this opinion directly to the Attorney General of the United States.

**PETITION FOR REVIEW DENIED.**