**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARCELO MARTINEZ-CEDILLO,
AKA Marcelo Martinez,

*Petitioner*,

v.

JEFFERSON B. SESSIONS III, Attorney
General,

*Respondent.*

No. 14-71742

Agency No.
A074-112-169

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted August 28, 2017
Pasadena, California

Filed July 23, 2018

Before: Kim McLane Wardlaw and Jay S. Bybee, Circuit
Judges, and Susan Illston,[*] District Judge.

Opinion by Judge Bybee;
Dissent by Judge Wardlaw

---

[*] The Honorable Susan Illston, United States District Judge for the
Northern District of California, sitting by designation.

# SUMMARY[**]

## Immigration

The panel denied a petition for review of the Board of Immigration Appeals' determination that Marcelo Martinez-Cedillo's conviction for child endangerment, in violation of California Penal Code § 273a(a), constitutes a crime of child abuse that renders him removable under 8 U.S.C. § 1227(a)(2)(E)(i).

In 2008, Martinez-Cedillo was convicted of felony child endangerment under California Penal Code § 273a(a) for driving under the influence with a child in his car who was not wearing a seatbelt.

In *Matter of Velazquez-Herrera*, 24 I. & N. Dec. 503 (BIA 2008), the Board interpreted the term 'crime of child abuse' broadly to mean any offense involving an intentional, knowing, reckless, or criminally negligent act or omission that constitutes maltreatment of a child or that impairs a child's physical or mental well-being, including sexual abuse or exploitation. In *Matter of Soram*, 25 I. & N. Dec. 378 (BIA 2010), the Board held that this definition is not limited to offenses requiring proof of injury to the child and requires a case-by-case analysis to determine whether the risk of harm is sufficient to bring an offense within the definition of 'child abuse.'

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the Board's interpretation in *Velazquez-Herrera* and *Soram* is entitled to *Chevron* deference. Applying that definition, the panel held that California Penal Code § 273a(a) is a categorical match to the crime of child abuse, neglect, or abandonment. The panel also held that the Board's interpretation applies retroactively to Martinez-Cedillo's 2008 conviction, which occurred before the Board's decisions in *Velazquez-Herrera* and *Soram*.

Dissenting, Judge Wardlaw would hold that the Board's interpretation is not entitled to *Chevron* deference, and that even if it were, the new definition should not apply retroactively to Martinez-Cedillo's conviction.

---

## COUNSEL

David Belaire Landry (argued), San Diego, California, for Petitioner.

Brianne Whelan Cohen (argued), Senior Litigation Counsel; John S. Hogan, Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

---

**OPINION**

BYBEE, Circuit Judge:

Marcelo Martinez-Cedillo was convicted of felony child endangerment under California Penal Code § 273a(a) and ordered removed on the grounds that his conviction qualified as "a crime of child abuse, child neglect, or child abandonment" under INA § 237(a)(2)(E)(i), 8 U.S.C. § 1227(a)(2)(E)(i). His petition for review requires us to decide whether to defer to the Board of Immigration Appeals' ("BIA's") interpretation of a crime of child abuse, neglect, or abandonment under *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Our sister circuits have split on this precise issue. *See Florez v. Holder*, 779 F.3d 207 (2d Cir. 2015) (deferring to the BIA); *Ibarra v. Holder*, 736 F.3d 903 (10th Cir. 2013) (not deferring); *see also Mondragon-Gonzalez v. Att'y Gen. of the United States*, 884 F.3d 155 (3d Cir. 2018) (deferring); *Martinez v. U.S. Att'y Gen.*, 413 F. App'x 163 (11th Cir. 2011) (deferring).

We join the Second Circuit in deferring to the BIA's reasonable interpretation. We further hold that California Penal Code § 273a(a) is categorically a crime of child abuse, neglect, or abandonment, as interpreted by the BIA. Finally, we hold that the BIA's interpretation applies retroactively to Martinez-Cedillo's conviction. Accordingly, we deny the petition for review.

## I. FACTUAL BACKGROUND

Marcelo Martinez-Cedillo is a citizen of Mexico and, since 2005, has been a lawful permanent resident of the United States. In August 2008, he was convicted of driving

under the influence of alcohol ("DUI") with two prior DUI convictions. At the time of his final DUI, he had a child in his car who was not wearing a seatbelt. For this reason, he was also convicted of felony child endangerment under California Penal Code § 273a(a).

The Department of Homeland Security initiated removal proceedings on the grounds that Martinez-Cedillo's conviction under California Penal Code § 273a(a) was a crime of child abuse, neglect, or abandonment under § 1227(a)(2)(E)(i). An Immigration Judge ("IJ") entered a final order of removal, which Martinez-Cedillo appealed to the BIA, arguing that (1) California Penal Code § 273a(a) is not a crime of child abuse, neglect, or abandonment, and (2) he should be allowed to apply for cancellation of removal under 8 U.S.C. § 1229b.

The BIA affirmed in part and remanded in part. The BIA held that California Penal Code § 273a(a) was categorically a crime of child abuse, neglect, or abandonment under its prior interpretation of that phrase in two precedential opinions: *Matter of Velazquez-Herrera*, 24 I. & N. Dec. 503 (BIA 2008), and *Matter of Soram*, 25 I. & N. Dec. 378 (BIA 2010). Nevertheless, the BIA remanded for the IJ to consider Martinez-Cedillo's eligibility for cancellation of removal.

On remand, Martinez-Cedillo initially requested cancellation of removal but later conceded that recent authority defeated his request. He then, for the first time, moved for a continuance of removal proceedings based on a pending visa petition his father had submitted on his behalf. The IJ denied his motion for a continuance and again entered a final order of removal. Martinez-Cedillo appealed to the BIA a second time, and this time, the BIA affirmed in full.

Martinez-Cedillo now petitions our court for review, arguing that (1) the BIA's interpretation of a crime of child abuse, neglect, or abandonment to encompass criminally negligent acts that do not result in actual injury to a child is unreasonable; (2) California Penal Code § 273a(a) is not categorically a crime of child abuse, neglect, or abandonment even under the BIA's interpretation; (3) the BIA's interpretation should not apply retroactively to his 2008 conviction; and (4) denial of his motion for a continuance was an abuse of discretion.

We first review the history of the BIA's interpretation of § 1227(a)(2)(E)(i), and then address each of Martinez-Cedillo's arguments in turn.

## II. THE BIA'S INTERPRETATION

### A. *Rodriguez-Rodriguez*

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which added § 1227(a)(2)(E)(i) to the INA and made "a crime of child abuse, child neglect, or child abandonment" a deportable offense. Two years later, the BIA made a passing reference to § 1227(a)(2)(E)(i) in *Rodriguez-Rodriguez*, 22 I. & N. Dec. 991 (BIA 1999). At issue in that case was 8 U.S.C. § 1101(a)(43)(a), which makes "sexual abuse of a minor" an "aggravated felony" for purposes of 8 U.S.C. § 1227(a)(2)(A)(iii). The BIA held that Texas's offense of indecency with a child was "sexual abuse of a minor" and thus an aggravated felony under § 1227(a)(2)(A)(iii), even though the Texas statute did not require physical contact with a child. The BIA reasoned that the term "sexual abuse of a

minor," like the term "child abuse" in § 1227(a)(2)(E)(i), could refer to conduct that did not involve physical contact:

> We note that in including child abuse as a ground of removal in section 237(a)(2)(E)(i) of the Act, Congress likewise did not refer to a particular statutory definition, although in the same section it did designate a statutory definition for the term "crime of domestic violence." By its common usage, "child abuse" encompasses actions or inactions that also do not require physical contact. See [*Child Abuse*, BLACK'S LAW DICTIONARY (6th ed. 1990)] (defining child abuse as "(a)ny form of cruelty to a child's physical, moral or mental well-being").

*Id.* at 996. *Rodriguez*'s passing reference to child abuse was dictum and did not purport to offer a precedential interpretation of what constitutes a crime of child abuse, neglect, or abandonment under § 1227(a)(2)(E)(i).

For several years following *Rodriguez*, the BIA never interpreted the phrase "a crime of child abuse, child neglect, or child abandonment" in a precedential opinion, and its unpublished decisions on the subject were equivocal. Some unpublished decisions during this period stated that "child abuse" means "the physical or mental injury, sexual abuse or exploitation, or negligent treatment of a child." *In re Palfi*, 2004 WL 1167145 (BIA 2004); *In re Baez-Cazarez*, 2004 WL 2952229 (BIA 2004). Other unpublished decisions hewed to the *Black's Law Dictionary* definition of "child abuse" as "any form of cruelty to a child's physical, moral or mental well-being." *In re Pacheco Fregozo*, 2005 WL

698590 (BIA 2005); *In re Maltez-Salazar*, 2005 WL 952489 (BIA 2005); *In re Manzano-Hernandez*, 2005 WL 698392 (BIA 2005). In short, the BIA's interpretation of a crime of child abuse, neglect, or abandonment was unclear at this time.

## B. *Velazquez-Herrera*

In 2006, we considered the BIA's holding that a conviction for assaulting a child under Washington's fourth-degree assault statute was a crime of child abuse. *Velazquez-Herrera v. Gonzales*, 466 F.3d 781 (9th Cir. 2006). We recognized that the BIA had previously used at least two definitions of "child abuse," which were "not entirely consistent" with each other. *Id.* at 783. We held that the "cruelty" definition cited in *Rodriguez*'s dictum was not "a statutory interpretation that carries the 'force of law'" and accordingly remanded "to allow the BIA in the first instance to settle upon a definition of child abuse in a precedential opinion." *Id.* at 782–83.[1]

The BIA followed our instructions and, in May 2008, issued its first precedential interpretation of what constitutes a crime of child abuse. *Velazquez*, 24 I. & N. Dec. 503. The BIA reasoned that, although § 1227(a)(2)(E)(i) defined "a crime of domestic violence," "other operative terms, including 'crime of child abuse,' were left undefined,

---

[1] Around this same time, two other Circuit Courts of Appeals reached a different result. The Eighth and Tenth Circuits considered the "cruelty" definition of "child abuse" and—even though the BIA had never adopted it in a precedential opinion—held the definition reasonable and deserving of deference. *Loeza-Dominguez v. Gonzalez*, 428 F.3d 1156 (8th Cir. 2005); *Ochieng v. Mukasey*, 520 F.3d 1110 (10th Cir. 2008). Neither court took into account—as we did, correctly—that the "cruelty" definition cited in *Rodriguez* was merely dictum.

triggering the negative inference that Congress deliberately left them open to interpretation." *Id.* at 508. The BIA further observed that, "[i]n view of the fact that [§ 1227(a)(2)(E)(i)] is the product of a significant expansion of the grounds of deportability and was aimed at facilitating the removal of child abusers in particular," Congress intended a crime of child abuse to be interpreted "broadly in this context." *Id.* at 509.

The BIA considered various federal statutes defining "child abuse" and related concepts as of the date Congress enacted IIRIRA and found that "the weight of Federal authority . . . reflected an understanding that 'child abuse' encompassed the physical and mental injury, sexual abuse or exploitation, maltreatment, and negligent or neglectful treatment of a child." *Id.* at 511. The BIA also considered state criminal and civil statutes, concluding that "there was a growing acceptance by 1996 that the concept of 'child abuse' included not just intentional infliction of physical injury, but also acts of sexual abuse or exploitation, criminally negligent acts, or acts causing mental or emotional harm." *Id.* Finally, the BIA noted that the most recent edition of *Black's Law Dictionary*—as opposed to the prior edition cited in *Rodriguez*—defined "child abuse" as "[i]ntentional or neglectful physical or emotional harm inflicted on a child, including sexual molestation." *Id.* (quoting *Abuse*, BLACK'S LAW DICTIONARY (8th ed. 2004)).[2]

---

[2] *Black's Law Dictionary* had changed significantly between the two decisions. The 6th edition published in 1990 and cited in *Rodriguez* had not been fully modernized. The 7th edition published in 1999 (not long after Congress passed IIRIRA) was the first to be edited by Brian A. Garner and represented a "major overhaul" designed to bring *Black's* into conformance with modern developments in the law. *Preface to the Seventh Edition*, BLACK'S LAW DICTIONARY (7th ed. 1999); *see also* Sarah

Based on these considerations, the BIA "interpret[ed] the term 'crime of child abuse' broadly to mean any offense involving an intentional, knowing, reckless, or criminally negligent act or omission that constitutes maltreatment of a child or that impairs a child's physical or mental well-being, including sexual abuse or exploitation." *Id.* at 512. The BIA went on to note that:

> *At a minimum,* this definition encompasses convictions for offenses involving the infliction on a child of physical harm, even if slight; mental or emotional harm, including acts injurious to morals; sexual abuse, including direct acts of sexual contact, but also including acts that induce (or omissions that permit) a child to engage in prostitution, pornography, or other sexually explicit

---

Yates, *Black's Law Dictionary: The Making of an American Standard*, 103 Law Libr. J. 175, 197 (2011) ("Garner's revision of *Black's* was, in fact, more of a rewriting than a revision."). Accordingly, the 7th edition changed the definition of "child abuse" to cover both "intentional" and "neglectful" conduct. *Abuse*, BLACK'S LAW DICTIONARY (7th ed. 1999). The 8th edition, published in 2004, continued in the same direction by adding a second definition of "child abuse" as "[a]n act or failure to act that presents an imminent risk of serious harm to a child." *Abuse*, BLACK'S LAW DICTIONARY (8th ed. 2004). *Black*'s progression between 1990 and 2004 toward greater recognition of criminally negligent "child abuse" validates the BIA's observation in *Velazquez* that "there was a growing acceptance by 1996 that the concept of 'child abuse' included not just intentional infliction of physical injury, but also . . . criminally negligent acts." 24 I. & N. Dec. at 511. The same progression also validates the BIA's finding that, to the extent the word "cruelty" in the 1990 definition "implied that an abusive act must be committed with the specific intent to inflict suffering on a child, it was contrary to the weight of Federal and State authority in effect in 1996, under which criminally negligent acts sufficed." *Id.* at 511 n.13.

conduct; as well as any act that involves the use or exploitation of a child as an object of sexual gratification or as a tool in the commission of serious crimes, such as drug trafficking.

*Id.* (emphasis added). Significantly, however, the BIA did *not* address whether a crime of child abuse required actual injury to a child. A concurring opinion noted this very fact: "It should be noted that, broad though the definition is, it is unclear whether it extends to crimes in which a child is merely placed or allowed to remain in a dangerous situation, without any element in the statute requiring ensuing harm, e.g., a general child endangerment statute, or selling liquor to an underage minor, or failing to secure a child with a seatbelt." *Id.* at 518 n.2 (Pauley, concurring).

## C. *Pacheco Fregozo*

We had our first opportunity to address *Velazquez*'s definition of a crime of child abuse in *Pacheco Fregozo v. Holder*, 576 F.3d 1030, 1033 (9th Cir. 2009). Ernesto Pacheco Fregozo had been arrested for driving under the influence of alcohol with two children in his car and convicted of *misdemeanor* child endangerment under California Penal Code § 273a(b). *Id.* at 1033–34. The BIA held in an unpublished opinion—issued before it decided *Velazquez*—that Pacheco Fregozo's conviction was categorically a crime of child abuse under the "cruelty" definition cited in *Rodriguez. Id.* at 1034.

In granting Pacheco Fregozo's petition for review, we acknowledged that the BIA had recently interpreted "a crime of child abuse" in *Velazquez* but held that it was unnecessary

to remand for the BIA to apply *Velazquez* in the first instance. *Id.* at 1036 ("We are convinced that a remand is not necessary in this case. Aside from according *Chevron* deference to the Board's interpretation of a 'crime of child abuse' in the INA, which we do, we review de novo whether the California conviction is a removable offense."). We interpreted *Velazquez* as requiring conduct that "actually inflict[s] *some* form of injury on a child," without explaining where the BIA's decision imposed such a requirement. *Id.* at 1037. Based on that questionable reading of *Velazquez*, we then concluded that California Penal Code § 273a(b) was not a categorical match for § 1227(a)(2)(E)(i) because it reached conduct that "creates only potential harm to a child; no actual injury to a child is required." *Id.* at 1036–38.

We also held that § 273a(b) was not a categorical match for a crime of child abuse for an independent reason. Unlike the felony provision in the same statute, § 273a(b) does not require "any particular likelihood of harm to a child":

> [U]nlike the analogous felony provision, California Penal Code section 273a(a), the misdemeanor provision [in section 273a(b)] does not require that the perpetrator *actually* endanger the health or safety of the child at all—the misdemeanor provision applies where the child's health or safety "may be endangered" by the circumstances. The BIA's definition of "child abuse," requiring some actual injury to a child, does not reach conduct that merely *could* place a child's health and safety at risk.

. . . . Negligent or intentional conduct that places a child in situations in which *serious* harm is imminently likely could fairly constitute "impairment" of a child's well-being. The misdemeanor California statute under which Pacheco was convicted, however, does not conform to the alternative definition, as it applies "under circumstances or conditions *other than those* likely to produce great bodily harm or death." Cal. Penal Code § 273a(b) (emphasis added).

*Id.* at 1037–38. This alternative basis for our holding in *Pacheco Fregozo* appears to have been in tension with the first, as it implied that *Velazquez* did not require actual injury but only *actual endangerment*. At the very least, our discussion in this regard suggested that, even though misdemeanor child endangerment under § 273a(b) was not a categorical match for a crime of child abuse as defined in *Velazquez*, felony child endangerment under § 273a(a) likely was.

D. *Soram*

The following year, the BIA responded to our decision in *Pacheco Fregozo*. In *Matter of Soram*, the BIA "respectfully clarif[ied] that the term 'crime of child abuse,' as described in *Velazquez-Herrera* is not limited to offenses requiring proof of injury to the child":

[T]he United States Court of Appeals for the Ninth Circuit has issued a decision addressing this question. *Fregozo v. Holder*, 576 F.3d 1030 (9th Cir. 2009). The court interpreted

> our decision in *Matter of Velazquez-Herrera* to require that a child must actually be injured for a crime to constitute child abuse. . . . However, as indicated above, we did not directly address this issue in *Velazquez-Herrera*. We do so now and find no convincing reason to limit offenses under section 237(a)(2)(E) of the Act to those requiring proof of actual harm or injury to the child.

25 I. & N. Dec. 378, 380–81 (BIA 2010). At the same time, the BIA also clarified that "the phrase 'a crime of child abuse, child neglect, or child abandonment' in section 237(a)(2)(E)(i) of the Act denotes a unitary concept and [its] broad definition of child abuse [in *Velazquez*] describes this entire phrase." *Id.* at 381.

The BIA reasoned that "[a]s recently as July 2009, some 38 States [and several territories] . . . included in their civil definition of 'child abuse,' or 'child abuse or neglect,' acts or circumstances that threaten a child with harm or create a substantial risk of harm to a child's health or welfare." *Id.* at 382. In this respect, the BIA noted that "endangering a child can reasonably be viewed as either abuse or neglect" and that "some States include child endangerment in their definition of 'child abuse,' while a number of others consider it 'child abuse or neglect.'" *Id.* at 381. A concurring opinion added that: "A review of the criminal child abuse statutes of the various States reveals that as of September 1996, a majority of States—28—had criminal provisions punishing child endangerment offenses as part of their criminal child abuse statutes." *Id.* at 388 (Filppu, concurring).

The BIA also acknowledged that, although a crime of child abuse, neglect, or abandonment required only a risk of injury to a child, the risk had to be sufficiently great—thus placing an outer limit on its broad definition. *Id.* at 382–83. The BIA noted that different state statutes used different terms (e.g., "realistic," "serious," or "substantial") to describe the requisite level of risk, and that even statutes with similar terms were interpreted differently by various state courts. *Id.* Rather than attempt to analyze "the myriad State formulations of endangerment-type child abuse offenses" all at once, the BIA decided a case-by-case analysis was appropriate "to determine whether the risk of harm by the endangerment-type language . . . is sufficient to bring an offense within the definition of 'child abuse' under the Act." *Id.* at 383.

Contrary to what the dissent argues, Dissenting Op. at 38, *Soram* did not reflect a change in the BIA's position but rather addressed an issue that *Velazquez* had left open. The concurring opinion in *Velazquez* had expressly noted that whether a crime of child abuse required actual injury to a child remained an open question. Moreover, *Soram* responded to our court's misinterpretation of the BIA's prior decision. Despite what we said in *Pacheco Fregozo*, the BIA's decision in *Velazquez* nowhere intimated that child abuse required actual injury. At most, it noted that, "[a]t a minimum," child abuse included physical harm "even if slight," *as well as* mental or emotional harm, acts injurious to morals, and use of a child "as an object of sexual gratification." *Velazquez*, 24 I. & N. Dec. at 512. The BIA's correction of our misinterpretation was not a change in position but rather a clarifying, gap-closing measure.

### III.  *CHEVRON* DEFERENCE

We apply *Chevron*'s two-step framework to the BIA's construction of the INA in precedential decisions.  *See, e.g.*, *Reyes v. Lynch*, 842 F.3d 1125, 1133 (9th Cir. 2016).  "Under the first step, we determine whether Congress has directly spoken to the precise question at issue."  *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1073–74 (9th Cir. 2016) (quotation marks omitted).  If "Congress has not spoken to a particular issue or the statute is ambiguous," we pass to the second step and consider the agency's interpretation of the statute.  *Id.*  If the "agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation."  *Id.* (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)).

### A.  *Chevron* Step One

Section 1227(a)(2)(E)(i) states that "[a]ny alien who at any time after admission is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable."  Unlike the term "crime of domestic violence," no part of the phrase "a crime of child abuse, child neglect, or child abandonment" is defined in the INA.  There are no federal crimes of child abuse, neglect, or abandonment to provide analogous definitions, and unlike certain common-law crimes like burglary or assault, there are no widely accepted definitions of child abuse, neglect, or abandonment.

Section 1227(a)(2)(E)(i)'s language is broad and susceptible to multiple interpretations.  Every circuit court to

have considered it has noted its ambiguity. *See Florez*, 779 F.3d at 211 ("[W]e have little trouble concluding that the statutory provision is ambiguous."); *Ibarra*, 736 F.3d at 910 (rejecting the BIA's interpretation but only after acknowledging that "the statutory language is ambiguous"). We agree and therefore pass to step two.

B. *Chevron* Step Two

Step two is where our sister circuits have split. In *Florez*, the Second Circuit held that the BIA's interpretation was reasonable and entitled to deference. 779 F.3d 207.[3] Similar to the instant case, Nilfor Yosel Florez had been convicted of child endangerment under New York law for driving under the influence with children in his car and had been ordered removed under § 1227(a)(2)(E)(i). *Id.* at 208. The Second Circuit reasoned that, as of 1996 when Congress passed IIRIRA, "at least nine states had crimes called 'child abuse' (or something similar) for which injury was not a required element." *Id.* at 212. Although "even *more* states used a definition that *did* require injury," courts must not "look[ ] for the best interpretation, or the majority interpretation—only a reasonable one." *Id.* The Second Circuit concluded that the BIA acted reasonably in adopting a definition of child abuse "consistent with the definitions used by the legislatures of Colorado, Kentucky, Nebraska, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, and Virginia." *Id.*

---

[3] The Third Circuit has twice reached this same conclusion in unpublished opinions. *Mondragon-Gonzalez*, 884 F.3d at 159; *Hackshaw v. Att'y Gen. of the United States*, 458 F. App'x 137, 138 (3d Cir. 2012). In addition, the Eleventh Circuit has deferred to the BIA's interpretation in an unpublished opinion, where the parties did not dispute the interpretation's reasonableness. *Martinez*, 413 F. App'x 167.

Moreover, *Black's Law Dictionary* offered a definition of "child abuse" that did not require injury. *Id.* (citing *Abuse*, BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "child abuse" as "[a]n act or failure to act that presents an imminent risk of serious harm to a child")). Finally, *Soram*'s requirement of a *sufficiently high* risk of harm to a child ensured that the BIA's treatment of child-endangerment statutes would remain "within the realm of reason." *Id.*

In *Ibarra*, the Tenth Circuit reached the opposite conclusion. The facts were extraordinarily sympathetic: Elia Ibarra had unintentionally left her children home alone one evening while she was at work and, as a result, had been convicted of "child abuse—negligence—no injury" under Colorado law. 736 F.3d at 905. In subsequent removal proceedings, Ibarra conceded removability but sought cancellation of removal. *Id.* The BIA held her ineligible for cancellation on grounds that her conviction was a crime of child abuse, neglect, or abandonment. *Id.* at 906. The Tenth Circuit criticized the BIA for relying "primarily on definitions of 'child abuse' and 'child neglect' from civil, not criminal, law." *Id.* at 912. The court held that the BIA should have identified "the majority of states' consensus as of [the year Congress enacted IIRIRA] . . . to find the generic meaning of criminal child abuse." *Id.* at 914 (quotation marks omitted). The court then did its own fifty-state survey of state criminal laws, concluding that the majority of states (thirty-three) required a higher mens rea than criminal negligence for conviction of an offense not involving actual injury to a child. *Id.* at 915. On this basis, the court rejected the BIA's interpretation of a crime of child abuse, neglect, or abandonment as unreasonable. *Id.* at 915–16.

We agree with the Second Circuit and likewise hold that the BIA's interpretation of § 1227(a)(2)(E)(i) is reasonable and entitled to deference. *Velazquez* and *Soram* are careful decisions, and although they may not represent the only permissible construction of the statutory language at issue, the BIA was not unreasonable for the same reasons identified by the Second Circuit. That the BIA's interpretation does not require intentional or actual injury to a child—the critical distinctions in this case—would perhaps be troubling if the BIA were only interpreting the term "child abuse," but the term "child neglect" surely admits of such conduct. *See Neglect*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "child neglect" as "[t]he failure of a person responsible for a minor to care for the minor's emotional or physical needs;" and defining "willful neglect" as "intentional or reckless failure to carry out a legal duty, esp. in caring for a child").

Even as we agree with the Second Circuit, we decline to follow the Tenth Circuit's reasoning because we find it flawed. First, there is no inherent problem in the BIA relying partly on civil statutes to understand the phrase "a crime of child abuse, child neglect, or child abandonment." It would be unreasonable for the BIA to interpret that phrase, which refers to one who is "convicted of a crime," to cover a purely civil action, such as child neglect proceedings brought by a state's child protective services. We thus agree with the dissent that it would be improper for the BIA to use "a civil definition for a crime." Dissenting Op. at 50; *see also id.* at 42, 49–50. But that is not what the BIA did. Rather, the BIA used civil definitions to inform its understanding of which *convictions* are crimes of child abuse, neglect, or abandonment, and that is not unreasonable.

A phrase such as "child neglect" surely can serve both civil and criminal purposes, and there is nothing unreasonable in trying to find a definition that would serve both simultaneously. That the BIA looked to civil definitions of abuse and neglect does not detract from the fact that an alien's deportability depends on having been convicted of a crime. The only question is what crimes constitute child abuse, neglect, or abandonment, and for that the BIA was well within reason to look to civil definitions. In fact, civil law makes a particularly apt comparison here: parental rights adjudicated in civil child neglect proceedings implicate serious due process concerns, and courts have sometimes referred to terminating parental rights as a "civil death penalty," *see, e.g.*, *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. 2004); *In re K.D.L.*, 58 P.3d 181, 186 (Nev. 2002), and have required the state to satisfy a heightened burden of proof before terminating those rights, *see, e.g.*, *In re E.A.F.*, 424 S.W.3d 742, 746 (Tex. Ct. App. 2014); *In re B.A.C.*, 317 S.W.3d 718, 723–24 (Tenn. Ct. App. 2009).

Second, there is no requirement that the BIA interpret a generic offense in the INA to conform to how the majority of states might have interpreted that term at the time of amendment. That is one reasonable aid to interpreting statutes, but it is not the only reasonable method for doing so.[4] Contrary to the Tenth Circuit's argument, the Supreme

---

[4] The dissent cites several cases for the proposition that a survey of state laws may be helpful in interpreting federal law—a proposition we do not dispute. Dissenting Op. at 52–53. For example, the Supreme Court surveyed state criminal codes to supply "additional evidence about the generic meaning of sexual abuse of a minor." *Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1571 (2017). The Court ultimately found the phrase unambiguous at *Chevron* step one, *id.* at 1572, but noted that surveying state law, though "not required," "can be useful insofar as it

Court's decision in *Taylor* has no bearing on this issue. *See Ibarra*, 736 F.3d at 913 ("*Taylor* instructs courts to find that 'generally accepted contemporary meaning' by looking to 'the criminal codes of most States.'"). In *Taylor*, the Court interpreted the word "burglary" in a federal sentence enhancement statute and determined "that Congress meant by 'burglary' the generic sense in which the term is now used in the criminal codes of most States." 495 U.S. at 598. The Court relied on the "generally accepted contemporary meaning" and looked to elements common to the state definitions. *Id.* at 596, 598. The Court was not, however, reviewing an agency's interpretation of an ambiguous statute and did not purport to offer any guidance to lower courts employing *Chevron*'s two-step framework. Nothing in *Taylor* requires that the BIA conduct a fifty-state survey and agree with the majority approach among the states every time

---

helps shed light on the common understanding and meaning of the federal provision being interpreted." *Id.* at 1571 n.3 (citation and quotation marks omitted)). None of the cases cited by the dissent suggest that the majority approach among states is the *only* reasonable way of interpreting an ambiguous generic offense. Notably, almost all of the cases that the dissent cites in this regard do not involve *Chevron* deference at all but are instead instances of a court interpreting a statute in the first instance. *See, e.g.*, *Nijhawan v. Holder*, 557 U.S. 29, 47 (2009); *United States v. Garcia-Jimenez*, 807 F.3d 1079, 1084 (9th Cir. 2015); *United States v. Esparza-Herrera*, 557 F.3d 1019, 1025 (9th Cir. 2009).

Elsewhere, the dissent calls into question whether the BIA—or any agency—should receive deference from the courts in interpreting statutes. *See* Dissenting Op. at 53 (citing *Pereira v. Sessions*, No. 17-459, slip op. at 2 (Kennedy, J., concurring); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149, 1152, 1156 (10th Cir. 2016) (Gorsuch, J., concurring)). The origins and legitimacy of the *Chevron* doctrine provide interesting fodder for further thought, *see* Aditya Bamzai, *The Origins of Judicial Deference to Executive Interpretation*, 126 Yale L.J. 908 (2017), but revisiting *Chevron* is beyond our power.

it interprets an ambiguous generic offense in the INA. And recently the Court has referred to this methodology as an "aid [to] our interpretation . . . offering useful context." *Esquivel-Quintana*, 137 S. Ct. at 1571 n.3. The BIA's statutory construction is not constrained to a mere head-counting exercise.

*Taylor*'s methodology worked in context: "burglary" is a well-recognized legal term in the common law, the MPC, and state law.**[5]** By contrast, child abuse, neglect, and abandonment are not common law crimes; they are twentieth-century crimes. According to *Black's Law Dictionary*, the first prosecution for child abuse was in 1874, when "[a]n eight-year-old girl named Mary Ellen was found to have been severely abused. Her abusers were prosecuted under the law for prevention of cruelty to animals *since no law protecting children then existed*." *Abuse*, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added). Similarly, the MPC offers virtually no clue to the terms in § 1227(a)(2)(E)(i). *See* MPC

---

**[5]** Similarly, our decision in *United States v. Garcia-Santana* employed *Taylor*'s methodology to interpret the term "conspiracy"—a term that, much like "burglary," has a long history in the common law and is the subject of wide modern consensus. 774 F.3d 528, 534–35 (9th Cir. 2014). In *Garcia-Santana*, we surveyed definitions of conspiracy in state and federal statutes, the Model Penal Code ("MPC"), and scholarly commentary and concluded that all of these indicia pointed toward an overt act element in the generic definition of conspiracy. *Id.* In light of this widespread agreement on conspiracy requiring an overt act, we concluded that the BIA's contrary interpretation was not entitled to deference. *Id.* at 542. We did not hold, however, that *Taylor* prescribes the exclusive methodology for interpreting the INA's language in every case—and certainly not the exclusive methodology for interpreting the language at issue here. Unlike conspiracy, there is significant ambiguity in the phrase a crime of child abuse, neglect, or abandonment, as every court to consider the issue has recognized.

§ 230.4 (Endangering Welfare of Children). The notes to the MPC explain: "The crimes of endangering the welfare of children and persistent nonsupport represent substantial modification and consolidation of offenses that were *variously treated* in prior law and that have also received *widely differing treatment* in recent revisions." MPC Pt. II, Art. 230, Refs. & Annos. (emphasis added).

Moreover, states have developed different and varied terms in this area, thus complicating Congress's task in describing what crimes involving children count as crimes of child abuse, neglect, or abandonment. Indeed, it seems that Congress purposefully employed the overlapping concepts of child abuse, neglect, and abandonment to denote a broad array of crimes. As a BIA member's concurring opinion in *Velazquez* noted, "crimes of child neglect or abandonment are a subset of 'child abuse' and, although technically redundant, were likely *inserted by Congress to assure coverage of such crimes, however denominated by the State*." 24 I. & N. Dec. at 519 (Pauley, concurring) (emphasis added). In short, the lack of a common source for the terms and the varied ways in which states have addressed the problem of child abuse—however it is denominated—only reinforces the ambiguity in what constitutes a crime of child abuse, neglect, or abandonment. It is precisely because of that ambiguity that we must proceed to *Chevron* step two, where there is no single methodology for resolving ambiguity in a statute.

Third, the Tenth Circuit's ambitious, fifty-state survey was itself problematic. The court categorized state laws according to the minimum mens rea they required for

conviction of a crime not resulting in injury to a child.**⁶** It found twenty-seven jurisdictions requiring "a minimum *mens rea* of knowingness or intent for crimes not appearing to require a resulting injury to the child;" six requiring "a minimum *mens rea* of criminal negligence for crimes not requiring a resultant injury;" eleven requiring "criminal negligence" or something less for crimes not a resultant injury; and five that had no clear standard. *Id.* at 915, 918–21. The court concluded that, because "a clear majority of states did not criminalize such conduct when it was committed with only criminal negligence and resulted in no injury," the BIA's construction of § 1227(a)(2)(E)(i) fell "outside the interpretive 'gap' left by Congress." *Id.* at 918.

The Tenth Circuit's methodology fails even under its own rules, and we need look no further than the California statute at issue here. According to the Tenth Circuit, § 273a(a) "required a minimum mens rea of knowingness or intent for crimes not appearing to require a resulting injury to the child." *Ibarra*, 736 F.3d at 918. The Tenth Circuit therefore included California in its "majority" of states that supposedly contradicted the BIA's interpretation. According to the

---

**⁶** The Tenth Circuit included in its survey crimes labeled "child abuse," "child neglect," and "child abandonment" because these were "well-known terms of art" that Congress employed. *Id.* at 914. The court also added "child endangerment," "cruelty to children," and "unlawful conduct toward child" to its survey because they "reflect[ed] the 'cluster of ideas' behind the terms Congress actually used." *Id.* But it chose not to include crimes of "nonsupport," "contributing to delinquency," "enticement," or "other sundry crimes involving children that state criminal codes may include." *Id.* The court made no real effort to explain these seemingly arbitrary distinctions. In any event, it strikes us as very odd that the court would feel free to add phrases to a statutory list of "well-known terms of art."

California Supreme Court, however, California Penal Code § 273a(a) requires only a minimum mens rea of "criminal negligence." *People v. Valdez*, 42 P.3d 511, 517 (Cal. 2002) ("[F]or 25 years, the lower courts have identified criminal negligence as the relevant standard of culpability for section 273a . . . , and this court has applied that same standard."). The Tenth Circuit's mistake in this regard reinforces that a fifty-state survey—particularly one of difficult to discern mens rea categories—is not the only reasonable way to interpret the INA.

Fourth, an agency need not give an answer to every conceivable question in one decision. The BIA noted in *Soram* that different state statutes employ different language regarding their requisite level of risk and that even similar statutes have been interpreted differently by various state courts. 25 I. & N. Dec. at 382–82. Further, the BIA held that the risk of injury to a child must be sufficiently great, and it carefully explained why the Colorado statute at issue met that requirement. *Id.* at 383–86. It was reasonable for the BIA to decline to analyze all at once "whether the myriad State formulations of endangerment-type child abuse offenses come within the ambit of 'child abuse' under . . . the Act." *Id.* at 383. Indeed, the Tenth Circuit's flawed fifty-state survey shows the danger of a contrary approach.[7]

---

[7] In this regard, we disagree with the dissent's suggestion that the BIA's definition "is so imprecise, it violates 'essential' tenets of due process," such as the void-for-vagueness doctrine. Dissenting Op. at 41 (quoting *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018)). The Supreme Court's decision in *Dimaya* does not support the dissent's position. There, the Court held that the residual clause incorporated in § 1101(a)(43)(f)'s definition of "a crime of violence" was void for vagueness. 138 S. Ct. at 1216. The residual clause made any "offense that is a felony and that, by its nature, involves a substantial risk that

Finally, this is not a case of the BIA changing positions without explaining its rationale for doing so. For one, the BIA did not change its position: *Rodriguez*'s brief discussion of § 1227(a)(2)(E)(i) was dictum; *Velazquez* gave the first precedential interpretation of § 1227(a)(2)(E)(i) but left the issue of actual injury undecided; and *Soram* merely filled the gap that *Velazquez* left open. The dissent's strained reading of *Rodriguez* and *Velazquez* tries to hold the BIA to an interpretation that was never in fact the agency's position. More importantly, even if one thought the BIA had changed its position, the BIA has explained its reasoning. *See Brand X*, 545 U.S. at 981. It is only an "[u]nexplained inconsistency" that is a reason for finding an interpretation unreasonable. *Id.*; *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016). Indeed, in *Chevron* itself, the Supreme Court "deferred to an agency interpretation that was a recent reversal of agency policy." *Brand X*, 545 U.S. at 981 (citing *Chevron*, 467 U.S. at 857–58). The BIA's interpretation in *Soram* was a response to our decision in *Pacheco Fregozo* and gave sufficient reason for why the agency believed a crime of child abuse, neglect, or abandonment did not require proof of actual injury. This was

---

physical force against the person or property of another" a deportable offense. *Id.* at 1211 (quoting 18 U.S.C. § 16(b)). Here, although § 1227(a)(2)(E)(i) is ambiguous, neither the parties nor any prior court has suggested that the statute is somehow void for vagueness. Indeed, the dissent takes no issue with the statute itself but only with the BIA's interpretation of it. By interpreting § 1227(a)(2)(E)(i), the BIA gave more specificity to the statute, not less.

not a change in the BIA's position, but even if it had been, it was suitably explained.**[8]**

In sum, we hold that the BIA's interpretation of a crime of child abuse, neglect, or abandonment in *Velazquez* and *Soram* is a reasonable construction of ambiguous statutory language. We therefore join the Second Circuit in deferring to the BIA's interpretation.

## IV.  THE CATEGORICAL APPROACH

We next consider whether Martinez-Cedillo's conviction under California Penal Code § 273a(a) is categorically a crime of child abuse, neglect, or abandonment, as interpreted by the BIA. We apply *Skidmore* deference to the BIA's *nonprecedential* holding in this case that § 273a(a) is categorically such a crime. *See Marmolejo-Campos v. Holder*, 558 F.3d 903, 909 (9th Cir. 2009). "Under *Skidmore*, the measure of deference afforded to the agency varies depending upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it

---

**[8]** The dissent argues that the BIA in *Soram* "reversed its own long-standing precedent instructing that the generic definition of a federal crime should reflect a uniform, national standard." Dissenting Op. at 45. To the contrary, *Soram* reaffirmed that "the term 'crime of child abuse' will be determined by reference to a 'flexible, uniform standard . . . .'" 25 I. & N. Dec. at 381 (quoting *Velazquez*, 24 I. & N. Dec. at 508). *Soram* retained the same uniform, national definition that the BIA had adopted in *Velazquez*, while clarifying that the definition admitted of child endangerment offenses. The fact that the BIA chose not to apply its uniform, national definition to every state child endangerment statute all at once does not reflect a change in the agency's position.

power to persuade, if lacking power to control." *Id.* (alteration and quotation marks omitted).

Under the categorical approach, we look "not to the facts of the particular prior case" but to whether "the state statute defining the crime of conviction" categorically fits within the "generic" federal offense. *Moncrieffe v. Holder*, 569 U.S. 184 (2013). The relevant section of the California statute states:

> Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years.

Cal. Penal Code § 273a(a). As noted above, the California Supreme Court has interpreted § 273a(a) to cover criminally negligent conduct resulting in risk of "great bodily harm or death" to a child. *Valdez*, 42 P.3d at 517; *see also Ramirez v. Lynch*, 810 F.3d 1127 (9th Cir. 2016).[9]

---

[9] In *Ramirez*, we held that § 273a(a) is not categorically a "crime of violence" but did not address whether it is categorically a crime of child abuse, neglect, or abandonment. 810 F.3d at 1127.

Even before the BIA decided *Soram*, our decision in *Pacheco Fregozo* strongly suggested that felony child endangerment under § 273a(a) was categorically a crime of child abuse, neglect, or abandonment.[10]  576 F.3d at 1037–38. After *Soram*, the result is all the more clear.  Unlike § 273a(b), § 273a(a) requires criminally negligent conduct under "conditions likely to produce great bodily harm or death" to a child.  *See id.*; *People v. Sargent*, 159 Cal. Rptr. 771 (Cal. Ct. App. 1979) (holding that § 273a(a) is "intended to protect a child from an abusive situation in which the probability of serious injury is great").[11]  This high degree of risk brings the crime completely within the ambit of the BIA's broad interpretation.  *See Soram*, 25 I. & N. Dec. at 378; *Velazquez-Herrera*, 24 I. & N. Dec. at 512.

---

[10]  Martinez-Cedillo incorrectly suggests that, because the facts underlying his conviction are similar to the facts in *Pacheco Fregozo*, § 273a(a) is not categorically a crime of child abuse, neglect, or abandonment.  This misunderstands the categorical approach, which looks to elements, not facts.  *See Moncrieffe*, 569 U.S. at 184.  Section 273a(a) requires proof of "circumstances or conditions likely to produce great bodily harm or death."  Section 273a(b), by contrast, covers only those acts "other than those likely to produce great bodily harm or death." Section 273a(a) is a felony; § 273a(b) is a misdemeanor.  The dissent fails to address this distinction when it claims that there is "no consistency in our current approach" because in two cases in which a father drove drunk with children in the car "one was deemed removable and the other was not."  Dissenting Op. at 44.

[11] California's jury instructions for § 273a(a) require the jury to find that "[t]he defendant . . . caused or permitted the child to (suffer/ [or] be injured/ [or] be endangered)) under circumstances or conditions likely to produced (great bodily harm/ [or] death)."  Judicial Council of California Criminal Jury Instruction 821.

## V.  RETROACTIVITY

Martinez-Cedillo argues that he pled guilty of violating § 273a(a) before the BIA decided *Soram* and that therefore *Soram* should not apply to his conviction.  We apply the five-factor *Montgomery Ward* test to address "the situation when a 'new administrative policy [is] announced and implemented through adjudication.'"  *Garfias-Rodriguez v. Holder*, 702 F.3d 504, 518 (9th Cir. 2012) (en banc) (quoting *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1328 (9th Cir. 1982)).  The five factors are:

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Id.*  Although the *Montgomery Ward* test was developed in the context of an agency overturning its own rule, it also applies where, as here, an agency disagrees with a court's decision.  *Id.*

The first factor is generally not "well suited to the context of immigration law" and does not weigh either for or against retroactivity.  *Id.* at 521.  The second and third factors "are closely intertwined" and do support retroactivity here.  *Id.*

The BIA's decision in *Soram* was not an abrupt departure from a well established practice but rather a clarification of a prior uncertainty. As explained above, a concurring opinion in *Velazquez* expressly noted that whether § 1227(a)(2)(E)(i) required actual injury was an open question. *Soram* thus "fill[ed] a void in an unsettled area of law" and cannot have come as "a complete surprise" to Martinez-Cedillo. *Id.* at 521–22. Although the fourth factor favors non-retroactive application because deportation is unquestionably a substantial burden, the fifth factor cuts in the other direction because "non-retroactivity impairs the uniformity of a statutory scheme, and the importance of uniformity in immigration law is well established." *Id.* at 523. In sum, the second, third, and fifth factors of the *Montgomery Ward* analysis favor retroactive application of *Soram*, and the BIA properly applied *Soram* to Martinez-Cedillo's conviction in this case.**[12]**

---

**[12]** The dissent cites *Montgomery Ward* but fails to adequately address all of its five factors. Dissenting Op. at 55–57. Instead, the dissent focuses on only two of the five factors, arguing that, because defendants are "acutely aware of the immigration consequences of their convictions," and because deportation is "a particularly severe penalty," the BIA's interpretation should not apply retroactively. *Id.* Importantly, the two factors the dissent relies upon would apply any time the BIA interprets a generic offense, such that no BIA decision would ever apply retroactively. This is inconsistent with how our court applies *Montgomery Ward*. *See Garfias-Rodriguez*, 702 F.3d at 519 ("In every case in which we have applied the *Montgomery Ward* test, we have done so on a case-by-case basis . . . ."). Indeed, the dissent's analysis would have required a different result in the very en banc decision in which we decided to apply *Montgomery Ward* to BIA decisions. *See id.* at 523 (holding BIA decision applied retroactively).

## VI.  REQUEST FOR A CONTINUANCE

Finally, Martinez-Cedillo challenges the denial of his request for a continuance.  An IJ may grant a continuance for "good cause shown."  8 C.F.R. § 1003.29.  "We review the denial of a continuance for an abuse of discretion."  *Id.*  Here, Martinez-Cedillo requested a continuance based on his pending visa application.  The IJ denied his request based on the untimeliness of the request, the remoteness of Martinez-Cedillo's priority date for a visa, and the speculative nature of his eligibility for adjustment of status, and the BIA affirmed for the same reasons.  There was no abuse its discretion.

## VII.  CONCLUSION

For the foregoing reasons, we **DENY** the petition for review.

WARDLAW, Circuit Judge, dissenting:

I respectfully dissent. The Board unreasonably interpreted the phrase "crime of child abuse, child neglect, and child abandonment," having inexplicably changed its generic definition three times in the past two decades. Its current definition is not entitled to *Chevron* deference. And even if it were, the new definition should not apply retroactively to Martinez.

I.

Martinez immigrated to the United States from Mexico in 1992, when he was sixteen years old. He became a lawful permanent resident in 2005, and thus was lawfully in the United States residing and working for more than fifteen years before the Department of Homeland Security (DHS) commenced these removal proceedings. Martinez has two U.S. citizen children, a son born in 2002 and a daughter in 2008. In August 2007 and April 2008, Martinez drove drunk near his home outside San Diego. Martinez's son was in the car without a seatbelt during those incidents.

In August 2008, Martinez pleaded guilty to violating California Penal Code section 273a(a) for the April 2008 incident and to violating California Vehicle Code section 23152(b) for driving under the influence of alcohol (DUI) with two or more prior DUIs. *See* Cal. Vehicle Code § 23152(b). The state judge sentenced Martinez to 364 days in jail and five years of probation. At the time, Martinez received a form, prepared by the San Diego Superior Court, that listed "Aggravated Felonies," as defined under 8 U.S.C. § 1101(a)(43) that "*will* result in Removal/Deportation" if the

noncitizen is convicted.**[1]**  The list of deportable aggravated felonies, however, included neither a conviction under California Penal Code section 273a(a) nor crimes of child abuse, child neglect, or child abandonment, though Martinez acknowledged elsewhere that his guilty plea could result in removal from the United States.

Three months after his guilty plea, DHS commenced removal proceedings against Martinez, charging removability as an immigrant "convicted of" a "crime of child abuse, child neglect, or child abandonment."**[2]** 8 U.S.C. § 1227(a)(2)(E)(i). Martinez moved to terminate the proceedings, arguing that a conviction under California Penal Code section 273a(a) was not categorically a crime of child abuse under *Matter of Velazquez-Herrera* (*Velazquez II*), 24 I. & N. Dec. 503 (B.I.A. 2008), the BIA definition in effect at the time he pleaded guilty.  The Immigration Judge (IJ) disagreed and entered a final order of removal.

Martinez then appealed to the BIA.  The Board concluded that California Penal Code section 273a(a) was a categorical match for the "crime of child abuse, child neglect, or child abandonment" under *Matter of Soram*, 25 I. & N. Dec. 378 (B.I.A. 2010), the definition the Board newly adopted while

---

**[1]** The form has a revised date of "12-07" or December 2007, a period of time during which the BIA required physical, mental, or emotional harm to a child for a conviction of child abuse, child neglect, or child abandonment to qualify as a deportable offense.

**[2]** Our court, sitting en banc, has recognized that drunk driving, by itself, is not a deportable offense because it is not a crime involving moral turpitude, *see Marmolejo-Campos v. Holder*, 558 F.3d 903, 913 (9th Cir. 2009) (en banc), so the agency could not have charged Martinez on that basis.

Martinez's petition awaited appeal. The Board affirmed the IJ's removal order and, after a partial remand to the IJ, concluded that Martinez was ineligible for voluntary departure.

Martinez now petitions for relief from the removal order. He argues that he is not removable because the definition of "crime of child abuse, child neglect, and child abandonment" in *Soram* is overbroad and an unreasonable interpretation of congressional intent, and because a conviction under California Penal Code section 273a(a) is not categorically a crime of child abuse under *Velazquez II*. Martinez argues, in the alternative, that, even if *Soram* is a reasonable interpretation of congressional intent, the Board should not have applied *Soram* retroactively to his 2008 conviction.

II.

"Vague laws invite arbitrary power," *Sessions v. Dimaya*, 138 S. Ct. 1204, 1223 (2018) (Gorsuch, J., concurring), as the Board's ever-changing definition of the "crime of child abuse, child neglect, or child abandonment" illustrates. In 1998, the BIA defined a crime of child abuse as "any form of cruelty to a child's physical, moral, or mental well-being." *In re Rodriguez-Rodriguez*, 22 I. & N. Dec. 991, 996 (B.I.A. 1999). That definition required intentional infliction of injury on the child. *See id.* (citing to Black's Law Dictionary (8th ed. 2014), which defined "cruelty" as an intentional and malicious act). In 2006, we concluded that the *Rodriguez* definition was dicta, not precedential and not entitled to deference because it was announced in an appeal about the separate crime of child sexual abuse. *See Velazquez-Herrera v. Gonzales* (*Velazquez I*), 466 F.3d 781, 782–83 (9th Cir. 2006). But, in the years between *Rodriguez* and *Velazquez I*,

and even after, several circuit courts of appeal accepted *Rodriguez* as a reasonable interpretation of § 1227(a)(2)(E)(i), *Ochieng v. Mukasey*, 520 F.3d 1110, 1114–15 (10th Cir. 2008); *Nguyen v. Chertoff*, 501 F.3d 107, 114 n.9 (2d Cir. 2007); *Loeza-Dominguez v. Gonzales*, 428 F.3d 1156 (8th Cir. 2005), and many lawful permanent residents relied on the definition to make decisions about how to plead in criminal proceedings, *see INS v. St. Cyr*, 533 U.S. 289, 322 (2001) ("There can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions."). After *Velazquez I*, we remanded the petition to the BIA with an invitation to issue a precedential decision. 466 F.3d at 782–83.

In response, the Board held that the generic definition of crime of child abuse includes crimes committed with a *mens rea* of criminal negligence so long as the convictions involve "the infliction on a child of physical harm, even if slight" or "mental or emotional harm, including acts injurious to morals . . . ." *Velazquez II*, 24 I. & N. Dec. at 512. The Board recognized that its generic definition had to reflect a "flexible, uniform standard," applicable nationwide, and could not make reference to "legal classifications that vary from State to State." *Id.* at 508 (citing *Kahn v. INS*, 36 F.3d 1412, 1414–15 (9th Cir. 1994)).

At the time, a concurring Board member, Roger Pauley, wrote separately to point out that the Board's definition was incomplete and confusing. It was "unclear," Pauley wrote, whether the Board's new definition extended to "crimes in which a child is merely placed or allowed to remain in a dangerous situation, without any element in the statute requiring ensuing harm," and Pauley included the example of

"failing to secure a child with a seatbelt." *Id.* at 518 n.2 (Pauley, concurring). Pauley also noted that the Board's definition ignored the statutory text, defining only the "crime of child abuse" without acknowledging that the phrase enacted by Congress included the "crime of child abuse, child neglect, and child abandonment." *Id.* at 518. Nevertheless, the Board issued its definition without adjusting or clarifying the meaning of the phrase.

After *Velazquez II*, we granted a petition for review in *Fregozo v. Holder*, 576 F.3d 1030 (9th Cir. 2009), holding that the *Velazquez II* definition requires injury to the child. *Id.* at 1036. There, Fregozo, a permanent resident, pleaded guilty to child endangerment under California Penal Code section 273a, subsection (b), after he drove drunk with his wife and two children in the car. *Id.* at 1033–34. We concluded that a conviction under section 273a(b) is not categorically a crime of child abuse under *Velazquez II* because the Board's then-interpretation required "*some* form of injury on a child" while section 273a(b) required only a potential harm to the child for a conviction, rendering the state statute broader than the generic federal crime. *Id.* at 1037.

In light of our decision in *Fregozo*, the BIA again revisited its definition of the crime of child abuse in December 2010. *Soram*, 25 I. & N. Dec. at 380. Changing course from its prior position that a crime of child abuse requires "infliction on a child of physical harm, even if slight," or "mental or emotional harm," *Velazquez II*, 24 I. & N. at 512, the BIA found "no convincing reason" to limit deportable offenses under § 1227(a)(2)(E)(i) to "those requiring proof of actual harm or injury to the child," *Soram*, 25 I. & N. Dec. at 378. The Board inexplicably looked to the

civil child abuse statutes in force in thirty-eight states as of 2009, not the criminal laws in effect in 1996 when Congress enacted IIRIRA. *Id.* at 382 (citing a 2009 Department of Health and Human Services compendium of the civil laws of thirty-eight states). A concurring board member, Lauri Filppu, remarked on the problem, and stated, "I find it most relevant to look to the criminal statutes of the various States in 1996, rather than the civil statutes." *Id.* at 386–87 (Filppu, concurring).

The Board changed its position between *Velazquez II* and *Soram* in two other respects as well. First, where the Board had rejected a state-by-state analysis in *Velazquez II*, it approved a state-by-state analysis in *Soram*, instructing IJs to look to state statutes "to determine whether the risk of harm required by the endangerment-type language" in the state statute is "sufficient to bring an offense within the definition of 'child abuse.'" *Id.* at 383 ("We find that a State-by-State analysis is appropriate to determine whether the risk of harm required . . . is sufficient."). After surveying state laws, the Board confirmed that states use different terms, like "realistic," "serious," "reasonably foreseeable," "substantial," and "genuine" to describe the level of risk required, and "approximately half of the States that include endangerment-type offenses in their definitions of 'child abuse' or 'child abuse or child neglect' [did] not specify the degree of threat required." *See id.* at 382–83 (collecting terms). But, eschewing its prior command to create a uniform, national definition, the Board left it to courts to decide "whether the risk of harm required by the endangerment-type language in any given State statute is sufficient to bring an offense within the definition of 'child abuse' under the Act." *Id.* at 383.

Second, the Board changed its position on whether the phrase "crime of child abuse, child neglect, or child abandonment" described a unitary concept. Where the Board in *Velazquez II* decided to define only the "crime of child abuse," the Board now confirmed that its new definition covered the entire scope of the deportable offense "a crime of child abuse, child neglect, or child abandonment." *Id.*

### III.

We review the Board's generic definition of a "crime of child abuse, child neglect, or child abandonment" announced in *Soram* under *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984). First, we ask "whether Congress has directly spoken to the precise question at issue,"—that is, whether the statute is ambiguous. *Id.* "If the intent of Congress is clear, that is the end of the matter." *Id.* But "if the statute is silent or ambiguous," the second question we must consider is "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843; *see also INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999) ("It is clear that principles of *Chevron* deference are applicable to [the INA's] statutory scheme.").

### A.

The majority correctly notes that all of the circuits to examine the issue agree that the phrase "crime of child abuse, child neglect, or child abandonment" in § 1227(a)(2)(E)(i) is ambiguous. *See Florez v. Holder*, 779 F.3d 207, 211 (2d Cir. 2015); *Ibarra v. Holder*, 736 F.3d 903, 910 (10th Cir. 2013); *Hackshaw v. Att'y Gen. of U.S.*, 458 F. App'x 137, 139 (3d Cir. 2012); *Martinez v. U.S. Att'y Gen.*, 413 F. App'x 163, 166 (11th Cir. 2011). Section 1227(a)(2)(E)(i) defines the

term "crime of domestic violence," but it does not define the phrase "crime of child abuse, child neglect, or child abandonment." 8 U.S.C. § 1227(a)(2)(E)(i). Because Congress did not speak to the question and each state defines the crimes of child abuse, child neglect, and child abandonment differently, the phrase is ambiguous.

## B.

The majority and I part ways at *Chevron*'s second step. The Board unreasonably changed the definition of the phrase "crime of child abuse, child neglect, and child abandonment," departing from standard rules of statutory construction to include "crimes" resulting in no injury to a child and by requiring a state-by-state risk analysis. Moreover, the Board unreasonably disregarded the Supreme Court's clear instructions as to how to determine the generic definition of a crime.

## 1.

As a matter of statutory interpretation, we must review the statute's language, purpose, history, and the agency's past decisions and controlling law to determine whether the Board's definition is reasonable. *See Taylor v. United States*, 495 U.S. 575, 581 (1990). To determine Congress's intent, we begin with the language of the statute—something neither the majority nor the Board did here. *See Mendez-Garcia v. Lynch*, 840 F.3d 655, 663 (9th Cir. 2016).

Section 1227(a) is structured around a list of seven "classes of deportable aliens," each "class" setting forth a distinct basis for removal of an "alien" from the United States. 8 U.S.C. § 1227(a). Section 1227(a)(2), the second of

the seven classes, lists "criminal offenses" for which an alien may be removed from the country. *Id.* § 1227(a)(2). This criminal offense class in turn lists five subsets of deportable crimes. *Id.* Section 1227(a)(2)(E)(i), the subsection applicable to Martinez, is within the category of "crimes of domestic violence, stalking, or violation of a protection order, [and] crimes against children." *Id.* Martinez was deemed removable for having been "convicted" of a "crime of child abuse, child neglect, or child abandonment," one of the generic crimes under this subsection. *Id.* § 1227(a)(2)(E)(i).

As its focus on "criminal offenses," convictions, and crimes indicates, the statute requires the Board to define the elements of a crime. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("Congress 'says in a statute what it means and means in a statute what it says there.'" (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)); *Bailey v. United States*, 516 U.S. 137, 145 (1995) (recognizing that proper statutory construction also requires considering a phrase's "placement and purpose in the statutory scheme"). Yet, the Board's generic definition of the "crime of child abuse" is so imprecise, it violates "essential" tenets of due process, most specifically "the prohibition of vagueness in criminal statutes." *Dimaya*, 138 S. Ct. at 1212. The Board explains that the generic definition of the "crime of child abuse, child neglect, or child abandonment" includes any "intentional, knowing, reckless, or criminally negligent" *mens rea*. *Soram*, 25 I. & N. Dec. at 380 (citing *Velazquez II*, 24 I. & N. Dec. at 512). The Board's *actus reus* test is even more vague. It includes conduct that does not result in *any* injury to the child, and the Board does not define the level of risk to which the child must have been exposed. *See id.* at 381, 382–83. The definition sweeps widely to include "mental or emotional

harm," "acts injurious to morals," "sexual abuse," and "sexually explicit conduct," combining multiple crimes and including terms covered elsewhere in the immigration codes. *Id.* at 380 (citing *Velazquez II*, 24 I. & N. Dec. at 512). Because the statutory language required the Board to define the elements of a specific crime—the "crime of child abuse, child neglect, or child abandonment"—this definition is an unreasonable interpretation of statutory text.

While the Board was supposed to define a criminal act, it instead swept into its definition statutes that are civil in nature, and in so doing, unreasonably read a term into the statute that is not there—endangerment. As discussed in greater detail in Part III.B.2, the Board relied on civil child endangerment statutes to craft the definition of "crime of child abuse, child neglect, or child abandonment," because it believed that "endangering a child can reasonably be viewed as either abuse or neglect" and because some states included endangerment as part of their child abuse and child neglect statutes. *Soram*, 25 I. & N. Dec. at 381. But there is a difference between these civil statutes and the crime of child endangerment. While child endangerment statutes share some elements with child abuse, neglect, and abandonment statutes, the crime of child endangerment, unlike the crime of child abuse, neglect, or abandonment, is chiefly concerned with the level of risk to the child, and it is, therefore, a different crime altogether.

Despite acknowledging that including endangerment offenses in the generic definition of the crime would require it to assess the level of risk to the child, *id.* at 382, the Board failed to define the precise level of risk required to render a state conviction a crime of child abuse, neglect, and abandonment, *id.* This is problematic not only because it

further unmoors the Board's definition from the statutory text but also because it leaves the definition judicially unadministrable and overly vague, along the lines the Supreme Court recently critiqued in *Dimaya*, 138 S. Ct. at 1213–15. The Board's definition creates uncertainty about how a court is to estimate the "degree of threat" to the child, particularly where the state statute does not specify the "degree of threat" required for a conviction. *Cf. id.* at 1213–14. Because the reviewing court must use the categorical approach to determine whether the statute of conviction is overbroad, the court will need to identify the level of risk of the "ordinary case" under the state statute of conviction and determine whether that level of risk is sufficiently high to meet the federal generic offense. The Supreme Court rejected a statute requiring similar analysis as unconstitutionally vague in *Dimaya*, and the Board's definition suffers from the same defects.[3]

The Board's vague definition makes it unreasonably difficult for a lawful permanent resident to predict whether he will be subject to immigration consequences as a result of a state court conviction, particularly for a child endangerment conviction where the state statute allows for a conviction without any resulting injury to the child. Is it enough that the statute criminalizes conduct that is "likely to produce great bodily harm or death[?]" *Cf.* Cal. Penal Code § 273a(a). Or, must the statute specify that the petitioner placed the child in

---

[3] Contrary to the majority's suggestion, *Dimaya* is not distinguishable merely because the ambiguity there appeared in a statute while the ambiguity here appears in the Board's definition. Where the ambiguity appears makes no practical difference for the IJs required to apply the rule or the immigrants who must rely on it—the definition is confusing all the same.

conditions where the child is at a "substantial risk of imminent death or physical injury[?]"  *Cf.* Ariz. Rev. Stat. § 13-1201.  What about just a "substantial risk of injury[?]"  *Cf.* Alaska Stat. § 11.51.100.  The Board's unreasonable failure to specify the level of risk required, coupled with its impermissible expansion into civil law, creates a quagmire that will confound our court for years to come.  There truly is no consistency in our current approach.  To date, our closest precedents involve two other fathers who drove drunk with their children in the car; one was deemed removable and the other was not.  *Cf. Florez*, 779 F.3d 207; *Fregozo*, 576 F.3d at 1030.

The majority makes the same mistake as the Board when it plucks the term "child neglect" out of the statute and suggests that this term, alone, is broad enough to support the Board's definition.  The majority concedes that the Board definition in *Soram* "would perhaps be troubling if the BIA were only interpreting the term 'child abuse,'" but it assures itself that, by including the term "child neglect," the definition "surely admits of such conduct."  This contention is distinctly at odds with the Board's conclusion that the phrase "crime of child abuse, child neglect, or child abandonment" has one meaning that pertains, in the same way, to all removal proceedings with national uniformity. 25 I. & N. Dec. at 381.  Congress could have crafted separate removable offenses for the "crime of child abuse," "crime of child neglect," and "the crime of child abandonment" that very well might have been a categorical match for section 273a(a).  But Congress, and the Board following its lead, chose to view the phrase as a "unitary concept," and so the Board definition should have reflected each term in the phrase together, rather than singling out the broadest among

them, as the majority suggests was appropriate. *Soram*, 25 I. & N. Dec. at 381.

The Board's unexplained change to its definition of what amounts to a crime of child abuse, neglect, or abandonment also underscores the irrationality of its current position. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016); *see also Perez-Guzman v. Lynch*, 835 F.3d 1066, 1078 (9th Cir. 2016) (applying *Chevron* and *Encino Motorcars* to interpret an INA provision). The Board changed its generic definition of the crime of child abuse three times in the last two decades, each time disrupting the expectations of the lawful permanent residents who rely on the Board's definitions. In 2008, at the time it promulgated its first precedential definition in *Velazquez II*, the Board knew that its definition was incomplete and confusing, *see* 24 I. & N. Dec. at 518 & n.2, but refused to adjust or clarify it. After our decision in *Fregozo*, where we confirmed that the Board's definition did not require actual injury, 576 F.3d at 1037, the Board revisited its prior definition and, knowing what it had known all along, adopted the concurring Board member's suggestions. The Board also reversed its own long-standing precedent instructing that the generic definition of a federal crime should reflect a uniform, national standard, *see Velazquez II*, 24 I. & N. Dec. at 508 (quoting *Kahn*, 36 F.3d at 1414–15), electing instead to instruct IJs and reviewing courts to look to different state statutes to determine whether the level of risk is "sufficient," without defining what specific level of risk satisfies the generic definition of the federal crime, *Soram*, 25 I. & N. Dec. at 383.

This case illustrates how the Board's ever-changing definitions harm lawful permanent residents, who rely on the Board's definitions. We know that Martinez pleaded guilty

to a violation of section 273a(a) at the time that the Board's definition of "crime of child abuse" required an injury for purposes of deportation, and we know that Martinez's son was not injured. Because Martinez had been here lawfully for more than fifteen years and had received information from the state court that told him that his crime was not among the list of removable offenses, when Martinez pleaded guilty he had reason to believe that his conviction would not render him removable—reason supported by the Board's then-current definition of the crime. Because this reliance interest is substantial in Martinez's case and in other cases like his, the Board should not be allowed to arbitrarily change its definition without explaining the need for a change. *See Encino Motorcars*, 136 S. Ct. at 2126 ("In explaining its changed position, an agency must also be cognizant that longstanding practices may have 'engendered serious reliance interests that must be taken into account." (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009))).

The majority insists that Board has not changed its definition from *Rodriguez* to *Soram*, but the majority's position is as baffling as it is wrong. Under *Rodriguez*[4] and *Velazquez II*, Martinez was not removable for having been convicted of a crime of child abuse, neglect, or abandonment, but under *Soram*, he is removable for the same crime. The Board's 1998 definition in *Rodriguez* required a minimum *mens rea* of "intentional and malicious" infliction of pain on the child, 22 I. & N. Dec. at 996, and that generic definition of the federal crime was not a categorical match for California Penal Code section 273a(a), which requires a minimum *mens rea* of criminal negligence, *see People v.*

---

[4] Although the definition in *Rodriguez* was dicta, it was accepted by the Second, Eighth, and Tenth Circuits as the operative agency definition.

*Valdez*, 27 Cal. 4th 778, 783–84 (2002). Similarly, the Board's 2008 definition in *Velazquez II*, as interpreted in *Fregozo*, required injury to the child, 24 I. & N. Dec. at 512; *see also Fregozo*, 576 F.3d at 1037, and that definition too was not a categorical match for California Penal Code section 273a(a), which does not require injury to the child, *see People v. Toney*, 76 Cal. App. 4th 618, 622 (1999). But, under the Board's 2010 definition in *Soram*, California Penal Code section 273a(a), for the first time, is a categorical match for the federal generic definition. Having dispensed with its prior requirement that the child suffer an injury, the Board, in this case, concluded that the elements of Martinez's state statute of conviction fell within the overbroad federal definition. The majority's willfully blind characterization of the Board's dithering definitions of this deportable offense does not match reality.

Nor does section 1227(a)(2)(E)(i)'s limited legislative history and purpose support the government's position that a crime of child abuse, child neglect, or child abandonment should include convictions that do not result in injury to the child. *See Taylor*, 495 U.S. at 581 (finding it "helpful" to review legislative history when determining whether an agency construction is reasonable); *see Ibarra*, 736 F.3d at 912 n.12. As originally enacted in 1952, the INA did not treat child abuse as an independent ground for deportability.[5] This ground did not appear until 1996 when Congress enacted IIRIRA, to, among other things, provide immigration consequences for "child abuse" and "child sexual abuse."

---

[5] Rather, such an offense may have been presumed a ground for deportation under the existing category of crimes involving moral turpitude. *See* 142 Cong. Rec. 8706 (Apr. 24, 1996) (statement of Sen. Coverdell).

142 Cong. Rec. 10,067 (May 2, 1996) (statement of Sen. Dole). Speaking in favor of the Dole-Coverdell Amendment, which added the section at issue to the INA, Senator Dole remarked that "[i]t is long past time to stop the vicious acts of stalking, child abuse, and sexual abuse." 142 Cong. Rec. S4613 (daily ed. May 2, 1996) (statement of Sen. Dole). The Board subsequently interpreted the statutory goal of the Dole-Coverdell Amendment as "singl[ing] out those who have been convicted of maltreating or preying upon children" and "facilitating the removal of child abusers in particular." *Velazquez II*, 24 I. & N. Dec. at 509.

The broadened definition of "crime of child abuse, child neglect, and child abandonment" in *Soram* does not further the statutory purposes of § 1227(a)(2)(E)(i), evinced by this legislative history and the statutory goals announced in the bill. Convictions for criminally negligent acts that do not result in any injury to a child cannot categorically be said to "prey[] upon" or "maltreat[]" children. *Id.* Indeed, the expansive definition that the Board adopted in *Soram* encompasses conduct that is neither vicious nor predatory, including conduct driven by poverty, such as leaving a child at home alone while a parent leaves for a brief errand or unintentionally failing to secure a babysitter for a child while the parent is at work. *See Ibarra*, 736 F.3d at 905. The Board's unreasonable sweep turns away from one of the fundamental tenets of our immigration law—"keeping families of United States citizens and immigrants united." *Fiallo v. Bell*, 430 U.S. 787, 795 n.6 (1977). It should not be lost on us that, while we fault Martinez for endangering his son, we simultaneously condone the separation of a family, exiling a father of two children who has resided in the United States lawfully for more than twenty-five years. That

Congress did not intend such a result is apparent from these facts.

2.

The Board's failure to follow legal precedent to derive the generic definition of a "crime of child abuse, child neglect, or child abandonment" resulted in a deeply flawed and arbitrary rule. The Board inexplicably and unreasonably looked to the civil child abuse statutes in thirty-eight states in force as of 2009, not the criminal laws in effect in 1996 when Congress enacted the statute. *Soram*, 25 I. & N. Dec. at 382 (citing a 2009 Department of Health and Human Services compendium of the civil laws of thirty-eight states). In *Velazquez II*, the Board made the same mistake, relying on federal civil statutes that were designed to protect child abuse victims and to encourage reporting of child abuse, and a 2004 edition of Black's Law Dictionary, which defined child abuse as the "[i]ntentional or neglectful physical or emotional harm inflicted on a child, including sexual molestation." *See Velazquez II*, 24 I. & N. Dec. at 509–11 (reviewing contemporaneous federal civil statutes and the dictionary).

The majority fails to acknowledge the unorthodoxy of the Board's reliance on civil law, yet cannot cite a single case approving of the use of civil law to provide the generic definition of a crime. While it may be true that "a phrase such as 'child neglect' surely can serve both civil and criminal purposes," it is a non-sequitur to conclude that "[i]t is not unreasonable for the BIA to use civil definitions to inform its understanding of which *convictions* are crimes of child abuse, neglect, or abandonment."

The majority asserts that civil child abuse laws are not meaningfully distinguishable from criminal child abuse laws, reasoning that, because state courts in Missouri, Nevada, Texas, and Tennessee have suggested that the termination of parental rights is the equivalent of the "civil death penalty," the Board's use of civil law in this context is "particularly apt." But we have long recognized the difference between civil child custody proceedings and criminal prosecutions. *See, e.g.*, *Costanich v. Dep't of Social & Health Servs.*, 627 F.3d 1101, 1115–16 (9th Cir. 2010) ("The special duties of prosecutors and the unique interests at stake in a criminal action do not parallel the duties and interests at stake in a civil child custody proceeding."). And rightly so, given that the process of civil adjudication is forward looking and focused on the protection of the child, with the ultimate goal of family reunification, whereas the criminal codes are backward looking and driven by purposes of punishment, retribution, and deterrence. *See Ibarra*, 736 F.3d at 911 ("The purpose of civil definitions is to determine when social services may intervene. The purpose of criminal definitions is to determine when an abuser is criminally culpable.").

It was unreasonable for the Board to craft what amounts to a civil definition for a crime. Looking to civil code sections to define the "crime of child abuse, child neglect, or child abandonment" unreasonably widens the net of people subject to removal proceedings. The civil codes encompass a broader array of conduct than their parallel criminal codes, which generally require a higher standard of culpability or a higher risk to the child. *See id.* at 911 n.9. In California, for example, an "endangered child" for purposes of child dependency proceedings includes a child who has "suffered" or is at "substantial risk" of suffering "serious physical harm or illness . . . as a result of the failure or inability of his or her

parent or guardian to adequately supervise or protect the child . . . ." Cal. Welf. & Inst. Code § 300. In contrast, to incur criminal liability, the California penal codes require the parent or guardian to have a mens rea of criminal negligence. *See Valdez*, 27 Cal. 4th at 783–84 (explaining that "willfully" in California Penal Code 273a means criminal negligence).

The majority excuses the Board's foray into civil law by concluding that the crimes of child abuse, neglect, and abandonment are "not common law crimes" but "twentieth-century crimes," not defined in the Model Penal Code, where states have "developed different and varied terms" to describe criminal conduct. But, that still does not explain why the Board looked to civil law to define criminal conduct. The majority laments that there is a "lack of a common source" for the criminal terms for child abuse, child neglect, and child abandonment, but the majority unreasonably ignores federal and state criminal laws, which could have served as just such a source. Had the Board examined the state criminal child abuse statutes, it would have found that the majority of states require a *mens rea* greater than criminal negligence or a greater risk of injury to the child before criminalizing the conduct. *See Ibarra*, 736 F.3d at 910–11, 916 (collecting state criminal statutes and concluding that, in 1996, thirty-three states required a minimum *mens rea* of recklessness, knowledge, or intent for crimes not involving a resulting injury to the child, while eight states required a *mens rea* of criminal negligence for crimes not resulting in injury, two states required a *mens rea* of tort negligence for no-injury conduct, and one state imposed strict liability). Even the Second Circuit, which the majority joins, recognized as much, as it identified only nine states that define criminal child abuse as broadly as the Board. *See Florez*, 779 F.3d at 212.

The majority criticizes the Tenth Circuit for performing a multi-jurisdictional analysis in the first instance, but the majority disregards that this is the *very same* methodology that the Supreme Court used just last year to define "sexual abuse of a minor," a phrase that appears in an adjacent INA code section. *See Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1571–72 (2017).    While the Supreme Court acknowledged that "this sort of multi-jurisdictional analysis" is "not required," it found it "useful insofar as it help[ed] shed light on the 'common understanding and meaning' of the federal provision being interpreted." *Id.* at 1571 n.3. Like the *Ibarra* court, the Supreme Court prepared its own Appendix of state laws, *id.* at 1573, and found it persuasive that, in 1996, when Congress added the term "sexual abuse of a minor" to the INA, a "significant majority of jurisdictions" had set the age of consent at sixteen for statutory rape offenses. *Id.* at 1571. Indeed, far from being an outlier, the use of fifty-state surveys of contemporaneous state criminal laws, as in *Esquivel-Quintana* and *Ibarra*, is a methodological hallmark of the categorical approach, regularly employed to derive the generic definition of a federal crime. *See, e.g.*, *United States v. Garcia-Jiminez*, 807 F.3d 1079, 1084 (9th Cir. 2015) (quoting *United States v. Garcia-Santana*, 774 F.3d 528, 534 (9th Cir. 2014)); *see also Nijhawan v. Holder*, 557 U.S. 29, 47 (2009) ("We examined state statutes . . . in effect in 1996, when Congress [enacted IIRIRA]."); *Perrin v. United States*, 444 U.S. 37, 42–45 (1979); *United States v. Esparza-Herrera*, 557 F.3d 1019, 1025 (9th Cir. 2009) (holding that thirty-three jurisdictions is a sufficient consensus to establish the federal generic definition of a crime); *Estrada-Espinoza v. Mukasey*, 546 F.3d 1147, 1152 (9th Cir. 2008) (en banc) ("In the absence of specific congressional guidance as to the elements of a crime, courts have been left to determine the 'generic sense in which the

term is now used in the criminal codes of most States.'"), *overruled on other grounds as recognized by United States v. Rivera-Constantino*, 798 F.3d 900, 904 (9th Cir. 2015).

### 3.

This case perfectly illustrates why we should be skeptical of ceding broad powers of interpretation to agencies with the authority to impose a "civil death penalty." "The BIA has no special expertise by virtue of its statutory responsibilities in construing state or federal criminal statutes." *Marmolejo-Campos v. Holder*, 558 F.3d 903, 907 (9th Cir. 2009) (en banc) (clarifying the standard of review). We do not defer to agencies, including the Board, when they construe state criminal statutes. *See id.*; *see also Uppal v. Holder*, 605 F.3d 712, 714 (9th Cir. 2010). And, at least two prominent jurists have questioned the "reflexive deference" that appellate courts have given to the Board, *see Pereira v. Sessions*, No. 17-459, slip op. at 2 (U.S. June 21, 2018) (Kennedy, J., concurring); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149, 1152, 1156 (10th Cir. 2016) (Gorsuch, J., concurring), particularly in the immigration context, where our modern administrative state enjoys the power "to penalize persons in ways that can destroy their livelihoods and intrude on their liberty even when exercising only purely civil powers," *see Gutierrez-Brizuela*, 834 F.3d at 1156 (Gorsuch, J., concurring). And while we defer to the Board when it construes an ambiguous term in the INA, the act it is charged with administering, *Marmolejo-Campos*, 558 F.3d at 910–11, we must not cease to question why that is so and whether it is warranted, *id.* at 910; *see also Pereira*, slip op. at 2–3 (Kennedy, J., concurring) (calling for reconsideration of *Chevron* deference in immigration context).

And the Board utterly failed to perform a statutory interpretation analysis consistent with Supreme Court teachings. *See Pereira*, slip op. at 9 (majority opinion). When the Board here said that the "crime of child abuse" should be interpreted "broadly," it was not deploying any insights that it might have obtained from adjudicating immigration cases. It was "parroting" what it had found in its own survey of federal and state civil statutes and a since-revised Black's Law Dictionary. *See Velazquez II*, 24 I. & N. Dec. at 510; *cf. Mei v. Ashcroft*, 393 F.3d 737, 739 (7th Cir. 2004) ("Since the Board hasn't done anything to particularize the meaning of 'crime involving moral turpitude,' giving *Chevron* deference to its determination of that meaning has no practical significance.").

The goal of establishing a uniform framework for the determination of the "crime of child abuse, child neglect, or child abandonment" might have been one reason for deferring to the Board, but the ship has sailed on this justification. The circuit split described in the majority opinion means that people convicted of identical crimes in states in the Tenth Circuit will be permitted to remain in the United States, while those in states in the Second and Ninth Circuits will be removed. The majority acknowledges this result, and yet permits the Board to proceed without correcting course.

Courts have a role in correcting arbitrary and capricious agency action, particularly where the agency has not used its expertise to develop its current approach. The majority follows the "troubling" path of the six circuit courts of appeals that were reversed in *Pereira v. Sessions*, in "an abdication of the Judiciary's proper role in interpreting federal statutes." *Pereira*, slip op. at 2 (Kennedy, J., concurring). An Article III court may not be equipped to

define, in the first instance, what the "crime of child abuse, child neglect, and child abandonment" should mean for the fifty states, but it is well within our authority to require the Board to do it properly. Here, where the Board strayed far from congressional intent, adopted a definition that misrelied on non-contemporaneous civil code sections, failed to follow Supreme Court authority instructing courts how to define generic criminal offenses, changed its position without adequate explanation, and ignored the context, language, and purpose of the statute, deference is not appropriate. The BIA's generic definition of the crime of child abuse, neglect, and abandonment in *Soram* is unreasonable and an impermissible interpretation of the statute.

IV.

Even if *Soram* were due the deference the majority concedes, the new definition should not apply retroactively to Martinez, who pleaded guilty to violating California Penal Code section 273a(a) in 2008, when *Velazquez II* was the Board's interpretation. Although, in general, "retroactive application is the presumptive norm," *Garfias-Rodriguez v. Holder*, 702 F.3d 504, 517 (9th Cir. 2012) (en banc), retroactivity must be "balanc[ed] [against] a regulated party's interest in being able to rely on the terms of a rule as it is written," *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1333 (9th Cir. 1982).

In the immigration context, we have determined that it is "contrary to 'familiar considerations of fair notice, reasonable reliance, and settled expectations'" to allow a newly enacted law to deprive non-citizens who have already pleaded guilty to certain crimes of the possibilities available to them at the time of their plea. *See St. Cyr*, 533 U.S. at 323–33; *see also*

*Judulang v. Holder*, 565 U.S. 42, 63 n.12 (suggesting that anti-retroactivity principles could apply equally to BIA decisions); *Landgraf*, 511 U.S. at 270 (stating that retroactivity analysis focuses on "considerations of fair notice, reasonable reliance, and settled expectations"). And many states, including California, the State in which Martinez pleaded guilty, require that trial judges advise defendants that immigration consequences may result from accepting a plea agreement. *See, e.g.*, Cal. Penal Code § 1016.5. Here, the Board's definition is particularly undeserving of retroactive application, given the Board's refusal to clarify its definition despite knowing it was confusing at the time it was made, and its changed position since. And, because our law requires us to assume that immigrant defendants will be "acutely aware of the immigration consequences of their convictions" when they enter plea agreements, *see St. Cyr*, 533 U.S. at 322, and because deportation is "'a particularly severe penalty,' which may be of greater concern to a convicted sentence than 'any potential jail sentence,'" *Dimaya*, 138 S. Ct. at 1213, the majority of the *Montgomery Ward* retroactivity factors weigh against retroactive application in this instance.[6]

Because the Board abused its discretion in applying *Soram* retroactively to Martinez's 2008 conviction, *Velazquez II* should have been the basis for a categorical analysis to determine whether Martinez's conviction under California Penal Code section 273a(a) is a categorical match for the generic definition of a crime of child abuse. California Penal Code section 273a(a) criminalizes conduct that does not result in injury to a child. Under *Velazquez II*, the federal generic definition of a "crime of child abuse" criminalizes conduct

---

[6] Factor one is neutral; factors two, three, and four favor Martinez; and factor five favors the government.

that results in injury to a child. 24 I. & N. Dec. at 512; *see also Fregozo*, 576 F.3d at 1037.[7] Because section 273a(a) criminalizes more conduct than *Velazquez II*'s federal generic definition of the crime, the California statute is not a categorical match to the federal generic definition. And because we previously concluded that section 273a(a) is not divisible, *see Ramirez v. Lynch*, 810 F.3d 1127, 1138 (9th Cir. 2016), the analysis should have stopped there, *see Sandoval v. Yates*, 847 F.3d 697, 704 (9th Cir. 2017) ("Only divisible statutes are subject to the modified categorical approach.").

Under the categorical approach, California Penal Code section 273a(a) is broader than *Velazquez II*'s definition of "crime of child abuse," so Martinez's conviction under California Penal Code section 273a(a) was not a crime of child abuse. Martinez is not removable under *Velazquez II* based on his 2008 conviction, and we should have vacated his removal order.

V.

The majority ignores controlling precedent to legitimize the Board's novel, and impermissible, approach to determining the generic definition of crimes listed in the INA. The Board's reliance on civil codes and Black's Law Dictionary leads it to an overbroad definition of the crime of child abuse, neglect, and abandonment that does not reflect

---

[7] The majority relies on dicta from *Fregozo* to support its argument that section 273a(a) is a categorical match for the federal generic offense of a crime of child abuse as defined in *Velazquez II.* But, as the majority concedes, to perfect its argument, it must ignore the dicta's "tension" with *Fregozo*'s central holding, which was that the federal generic definition of the crime of child abuse requires actual injury to the child. We should follow *Fregozo*'s holding—not its dicta.

state criminal laws and is contrary to what Congress meant by the use of the phrase "crimes of." We should grant Martinez's petition, and hold that the generic definition of "crime of child abuse, child neglect, or child abandonment" in *Soram* is an unreasonable interpretation of the INA, or, at the very least, that it should not apply retroactively to Martinez.